## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| RONALD ANDERSON | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil No.   13-cv-73-CJP[1] |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff Ronald Anderson is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying him Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.   For the reasons set forth below, the Commissioner's decision is reversed and this matter is remanded for rehearing and reconsideration of the evidence pursuant to sentence four of 42 U.S.C. §  405(g).

## PROCEDURAL HISTORY

Ronald Anderson's dealings with the Social Security Administration and his efforts to obtain DIB have been tortured and drawn-out.   He first filed an application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits in 2002.   The application was initially denied.   Instead of

---

[1] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c) (Doc. 10).

requesting reconsideration, Anderson filed new applications for DIB and SSI alleging disability since February 15, 2001 due to pain in his back and legs from a shattered disc.   These applications were denied initially, on reconsideration, and in the decision of Administrative Law Judge (ALJ) George A. Mills, III, dated December 2, 2004 (Tr. 465–78).

Instead of appealing ALJ Mills' decision or requesting reopening, Anderson filed new applications for DIB and SSI on July 13, 2006 alleging disability since February 15, 2001 due to disc problems, hernias, asthma, high cholesterol, and depression.   Again, both applications were denied initially and on reconsideration. Following an evidentiary hearing, ALJ Phillip C. Lyman issued a decision dated March 4, 2009 finding that principles of res judicata prohibited consideration of Anderson's disability status prior to December 2, 2004—the date of ALJ Mills' previous decision—but finding that Anderson was disabled as of October 23, 2006 (Tr. 595–606).   Because ALJ Lyman's decision made Anderson ineligible for DIB, Anderson sought judicial review of the decision.   The parties stipulated that a remand was necessary and the district court entered an order reversing and remanding Mr. Anderson's case to the Commissioner of Social Security for rehearing and reconsideration of the evidence pursuant to sentence four of 42 U.S.C. § 405(g) (Tr. 583–85).   Accordingly, the Appeals Council issued an order on March 2, 2012 vacating the decision of ALJ Lyman and remanding the case to a Seventh Circuit ALJ for further proceedings (Tr. 588–89).   The Appeals Council instructed that on remand the ALJ should "Further evaluate the claimant's physical

and mental limitations from the period beginning December 3, 2004 through October 22, 2006. That evaluation will include consideration of the medical and non-medical sources as required by Social Security Ruling 83-20" (Tr. 588).

ALJ Stuart T. Janney was assigned to the matter on remand. After holding an evidentiary hearing, ALJ Janney issued a decision on October 11, 2012 finding that Anderson was not disabled from December 3, 2004 through October 22, 2006 (Tr. 465–78). Anderson's SSI benefits were mistakenly cut-off, so ALJ Janney issued an amended decision on October 31, 2012 clarifying that Anderson was disabled as of October 23, 2006 and entitled to benefits as of that date (Tr. 850–51). Anderson appealed to this Court seeking judicial review of ALJ Janney's adverse decision.

## APPLICABLE LEGAL STANDARDS

### A.    Disability Standard

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes.[2] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.

demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  42 U.S.C. § 423(d)(3).  "Substantial gainful activity" is work activity that involves doing significant physical or mental activities for pay or profit.  20 C.F.R. § 404.1572.

The Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.  20 C.F.R. § 404.1520(a)(4); *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011).  If the ALJ determines that the claimant is disabled or not disabled at any step of the five-step inquiry, the inquiry ends without proceeding to the next step.  20 C.F.R. § 404.1520(a)(4).

The first step considers whether the claimant is presently unemployed.  20 C.F.R. § 404.1520(a)(4)(i).  If the answer is "no," the claimant is not disabled and the inquiry is over; if the answer is "yes," the inquiry proceeds to the next step.  *Id.* The second step evaluates whether the claimant has an impairment or combination of impairments that is severe, medically determinable, and meets the durational requirement.  20 C.F.R. § 404.1520(a)(4)(ii).  Again, if the answer is "no," the claimant is not disabled and the inquiry is over; if the answer is "yes," the inquiry proceeds to the next step.  *Id.*  The third step analyzes whether the claimant's severe impairment(s) meet or equal one of the listed impairments acknowledged to be conclusively disabling.  20 C.F.R. § 404.1520(a)(4)(iii).  If the answer is "yes," the claimant is automatically deemed disabled; if the answer is "no," the inquiry proceeds to the next step.  *Id.*

Before continuing to step four, the claimant's residual functional capacity ("RFC") is assessed.   20 C.F.R. § 404.1520(a)(4).   The fourth step assesses whether the claimant can perform past relevant work given his or her RFC.   20 C.F.R. § 404.1520(a)(4)(iv).   If the answer is "yes," the claimant is not disabled and the  inquiry is over; if the answer is "no," the inquiry proceeds to the next step. The fifth and final step assesses whether the claimant can perform other work given his or her RFC, age, education, and work experience.   20 C.F.R. § 404.1520(a)(4)(v).   If the answer is "yes," the claimant is not disabled and the claim is denied.   *Id.*   On the other hand, if the answer is "no," the claimant is deemed disabled.   *Id.*

**B.    Judicial Review**

The scope of judicial review of the Commissioner's decision is limited.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."   42 U.S.C. § 405(g).   Thus, the Court must determine not whether Anderson was in fact disabled, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011) ("On judicial review, a court will uphold the Commissioner's decision if the ALJ applied the correct legal standards and supported his decision with substantial evidence.")

The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).   In reviewing for "substantial

evidence," the entire administrative record is taken into consideration, but the Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.   *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).   In addition to supporting the decision with substantial evidence, the ALJ must also include an adequate discussion of the issues and "build an accurate and logical bridge" from the evidence to each conclusion.   *Berger v. Astrue,* 516 F.3d 539, 544 (7th Cir. 2008).

While judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.   *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010) (listing cases).   "If a decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, a remand is required." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)); *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) ("If the Commissioner's decision lacks adequate discussion of the issues, it will be remanded.")

## THE EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.   The following summary of the record is directed to the points raised by Anderson in his complaint and addressed in this Order.

### A.    Anderson's Background & Disability Allegations

Ronald Anderson was born in July 1958 and was 46 years old on the alleged

onset date—December 3, 2004.   He is 6 feet tall and weighed approximately 280 pounds during the relevant time period.   He lives in Carmi, Illinois with his wife, Shirley.   While in school, Anderson was enrolled in special education classes and he attended only through the ninth grade.   In February 2001, while working as a laborer on an oil rig, Anderson fell and injured his back.   He underwent back surgery in December 2001, but he continued to complain of severe back pain after the surgery.   He also has depression, asthma, chronic obstructive pulmonary disease, borderline intellectual functioning, diabetes, hypertension, obesity, and a history of alcohol and substance abuse.

Anderson submitted a number of forms to the Social Security Administration in September 2006, including a Disability Report, a Work History Report, and an Activities of Daily Living Questionnaire (Tr. 162–200).   Anderson also testified at evidentiary hearings in front of ALJ Lyman in January 2009 (Tr. 807–46), and in front of ALJ Janney in September 2012 (Tr. 485–582).   Anderson's wife, Shirley submitted a Third Party Function Report in September 2006 (Tr. 172–79).   At that time, she had known Anderson for 28 years.   Mrs. Anderson largely corroborated her husband's statements on his disability application.   Mrs. Anderson also testified at the September 2012 hearing in front of ALJ Janney.   Anderson and his wife provided extensive information about his physical impairments.   That information is not included here, however, because this order focuses on Anderson's mental impairment.   The following is a summary of Anderson's allegations regarding his mental impairment as presented on the agency forms and

at the evidentiary hearing.

In the documents submitted to the Social Security Administration, Anderson indicated that he left home alone only on occasion because his "nerves get bad and I have to have my wife go with me" (Tr. 195).   He does not enjoy being with others, he tends to get angry and fight with people, and he gets upset when others criticize him.   He testified that he has thought about suicide "a couple of times" (Tr. 534).   He "mostly just feel[s] depressed," and he lays in bed all day (Tr. 534–36).   He might stay in bed for a week at a time (Tr. 539).   He also said there are times when he cries because he does not know why he has so many health problems; "It happens all the time" (Tr. 536).   He said he's had these symptoms since 2002, "ever since I found out all the stuff that's wrong with me" (Tr. 536).   He further explained that he was seeing multiple doctors, "and when they tell you your life's on the line, you know, it kind of makes you feel bad" (Tr. 538).   When asked "Do you remember when it got as bad as it is now," Anderson answered probably six or seven years prior.

As for Anderson's wife, she indicated that Anderson does not do any household chores or yard work, does not make his own meals, does not shop, and does not even go outside very often.   He used to hunt, fish, mushroom hunt, play pool, play cards, and take his grandkids to the park, but he does not do any of those activities anymore.   He does not spend much time with others.   He does not leave the house except to go to the doctor.   She indicated that he has problems getting along with family and friends, and explained that he gets irritated very easily and he

will not even go to family gatherings anymore.   She indicated that he cannot pay attention for long, does not finish what he starts, cannot follow written directions, does not follow spoken directions well, and does not get along with authority figures.   He also does not handle stress well, or changes in routine.   She indicated that she has noticed unusual behavior or fears in her husband, and explained that "he has a jeckle [sic] & hyde personality anymore.   He's afraid I'll leave him because of how much he has changed since his injury and breathing problem; and I almost have a few times" (Tr. 177).   She then wrote an entire page in the section for additional remarks (Tr. 178).   She stated in pertinent part:

> Since Rons [sic] condition has been like this our whole way of living
> has changed.   His [sic] not the same man I met 28 years ago or six
> years ago.   All responsibility has went to me.   He get [sic] very upset a
> lot because he knows it is hard on me.   Anger and anxiety starts when
> he feels this way.   He has talked about suicide more than once
> especially when he cant hardly breathe.   The grandkids love him so
> much but he just cant do things with him he use [sic] too.   Thats very
> hard on him. . . . he was a mans man, now he cant do hardly anything.
> Its been a very rough road.

Mrs. Anderson's testimony at the evidentiary hearing was related to his cognitive deficits.   She did not provide any testimony regarding his mental health (Tr. 571–79).

**B.     Medical Records**

There are extensive medical records regarding Anderson's physical impairments, including his back injury, asthma, chronic obstructive pulmonary disease, diabetes, hypertension, and obesity.   Because this Order focuses on Anderson's mental health, the records pertaining to his physical impairments are

not relevant.   The following is therefore a summary of the medical records related to his mental health during the relevant time period.

Various medical records indicate that Anderson's mental impairment was present to some degree since at least February 2001.   At that time, he reported during a visit to the emergency room that he was taking Xanax (Tr. 769).   He reported that he was still taking Xanax in September 2001 (Tr. 743).   The following month, emergency room records note that Anderson's past medical history included depression, he was taking Celexa and Amitriptyline every day and Ativan as needed, and he was "tearful" (Tr. 726–27).   In December 2001, Anderson's back surgeon listed Xanax as one of his medications (Tr. 722, 724). That same month, he reported at the emergency room that he was taking Valium (Tr. 738).   In February 2002, Dr. Steven Rupert at Industrial/Sports and Medicine and Rehab noted in his initial assessment that Anderson had "depression and nervous breakdown in the past" and had taken Valium, Neurontin, and Amitriptyline in the past (Tr. 788, 791).   Dr. Rupert's notes from April 2002 and August 2002 indicate that Anderson was taking Valium (Tr. 782, 785).     In September 2002, Dr. Rupert stopped a medical procedure because Anderson was having chest pains, which he said "worsens with anxiety, when he gets mad, etc." (Tr. 780).   Dr. Rupert referred Anderson back to Dr. Conn, who was Anderson's primary care physician and had prescribed medications to him previously; Dr. Conn reportedly gave Anderson two prescriptions for anxiety (Tr. 780, 786).   By December 2002, Anderson had stopped taking Valium and was instead taking Paxil

(Tr. 776, 779).   In July 2004, Anderson complained of "being nervous and depressed" to Dr. Saqib, and he was prescribed Effexor XR (Tr. 797).   In February 2005, Dr. Saqib prescribed Cymbalta and Klonopin for his depression and anxiety (Tr. 315).   One year later, records from an emergency room visit indicate that Anderson had a psychiatric disorder and was taking Klonopin (Tr. 396).   In October 2006, Anderson reported to Dr. Warshauer that he was still taking Klonopin (Tr. 267).

**C.    Consultative Examinations & State Agency RFC Assessments**

David Warshauer, Ph.D., conducted a psychological examination of Anderson in September 2006 at the request of the State of Illinois in connection with his application for benefits (Tr. 266–69).   The examination lasted 50 minutes. Dr. Warshauer diagnosed Anderson with major depressive disorder, recurrent, severe, with borderline intellectual functioning, and assigned a Global Assessment of Functioning (GAF) score of 45.[3]   Dr. Warshauer also recommended an IQ test. On September 19, 2007, Dr. Warshauer administered the Wechsler Adult Intelligence test to Anderson (Tr. 329–31).   Anderson's verbal IQ was 69, his performance IQ was 72, and his full scale IQ was 67; all IQs falls at the upper end of the mild range of mental retardation or at the lower end of the borderline range. Dr. Warshauer determined that the scores were "both reliable and valid."

---

[3]  A GAF score of 45 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job, cannot work)." *See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, p. 34 (4th ed.).

Dr. Warshauer also completed a form entitled "Medical Source Statement of Ability to Do Work-Related Activities" (Tr. 332–34).   Dr. Warshauer found Anderson had extreme limitations, defined as a "major limitation . . . [t]here is no useful ability to function in this area," in three of the ten mental activities listed on the form: understanding and remembering complex instructions; carrying out complex instructions; and making judgments in complex work-related decisions. Additionally, Anderson had marked limitations, meaning a "serious limitation . . . [t]here is substantial loss in the ability to effectively function," in the other seven mental activities: understanding and remembering simple instructions; carrying out simple instructions; making judgment on simple work-related decisions; interacting appropriately with the public, interacting appropriately with supervisors; interacting appropriately with co-workers; and responding appropriately to usual work situations and to changes in a routine work setting. Dr. Warshauer further noted that Anderson's energy level was extremely low, and opined that he could not keep up "with even a reduced work load."   Dr. Warshauer opined that these limitations were present as of the date of his previous evaluation, October 23, 2006, and also stated that "all the above answers apply to the claimant assuming he is abstinent from alcohol and other substances."

On November 6 2006, prior to Dr. Warshauer administering the IQ test or issuing his medical source statement, a state-agency psychologist, Margaret Wharton, completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment (Tr. 270–87).   Dr. Wharton assessed whether

Anderson had a mental impairment and the limitations posed by that impairment *as of November 6, 2006*.   She opined that Anderson was not markedly limited in any of the twenty mental activities listed on the form.   He was moderately limited in six mental activities: understanding and remembering detailed instructions; carrying out detailed instructions; maintaining attention and concentration for extended periods; interacting appropriately with the general public; responding appropriately to supervisors; and getting along with coworkers.   He was not significantly limited in the remaining fourteen mental activities.

Dr. Wharton completed another Psychiatric Review Technique form nine days later, on November 15, 2006, and opined that there was insufficient evidence as to whether Anderson had a mental impairment prior to his date last insured, which was June 30, 2005 (Tr. 296–308).   No state-agency psychiatrist or psychologist addressed Anderson's mental status for the period of time between the date last insured and November 6, 2006.

It does not appear that any state agency physician conducted a physical consultative examination.   A Physical Residual Functional Capacity Assessment was conducted by state agency physician, Julio Pardo, M.D., on November 9, 2006 assessing Anderson's physical limitations *as of that date* (Tr. 288–95).   Dr. Pardo concluded that Anderson was capable of work at the light exertional level, with no additional postural, manipulative, visual, or communicative limitations. Anderson did have an environmental limitation in that he should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation

**D.    Vocational Expert's Testimony**

Following Anderson's testimony at the evidentiary hearing in September 2012, a vocational expert (VE) testified.   The VE was required to assume a person who was able to do work at the light exertional level, or the sedentary exertional level, with the following limitations:

- Avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation;
- Moderate difficulty in maintain sustained concentration, persistence, or pace, but can still understand, remember, and carry out simple or rote instructions, and can exercise independent judgment or decision-making for problems involving concrete variables in routine situations for two-hour work segments;
- Should work in a stable setting in terms of the tools used, the processes employed, or the setting itself, and change to any one of those three areas must be introduced gradually;
- Moderate difficulty maintaining social functioning, and therefore should have no work-related interaction with the public; May have frequent contact with coworkers and supervisors, but no interaction with the general public;
- Avoid concentrated exposure to hazards;

(Tr. 553–59).   The VE testified that this hypothetical person could not perform any of his past jobs, but there are unskilled occupations that exist in significant numbers in the local area that the person could perform.

If the hypothetical person needed an option to sit or stand as frequently as every five to 10 minutes, that person would be precluded from work at the sedentary level (Tr. 560).   If the hypothetical person had a marked limitation in concentration, persistence, or pace and would be consistently off-task for ten to fifteen percent of the workday, that person would be precluded from all work (Tr. 560–61).   If the hypothetical person could not do more than apply common sense

understanding, carry out simple one or two-step instructions, deal with standardized situations with occasional or no variables, that person would be precluded from all work (Tr. 566–67).

## THE DECISION OF THE ALJ

ALJ Stuart T. Janney followed the five-step analytical framework outlined in 20 C.F.R. § 404.1520 (*See* Tr. 465–78).   At step one, the ALJ determined that Anderson had not engaged in substantial gainful activity since December 3, 2004, the alleged onset date.   The ALJ also found that Anderson is insured for DIB through June 30, 2005.   At step two, the ALJ found that Anderson had the severe impairments of disorders of the spine, asthma, chronic obstructive pulmonary disease, obesity, borderline intellectual functioning, major depressive disorder, and a history of alcohol and substance abuse.   At step three, the ALJ determined that Anderson's impairments did not meet or equal a listed impairment.   In particular, the ALJ found that Anderson's depression did not meet Listing 12.04 because he had only moderate limitations in activities of daily living, social functioning, and concentration, persistence, or pace, consistent with Dr. Wharton's opinion.

The ALJ then determined that Anderson had the residual functional capacity to perform work at the light exertional level, except that he should avoid concentrated exposure to fumes, odors, dust, gases, and areas of poor ventilation with some limitations.   Additionally, due to moderate limitations in concentration, persistence, or pace and social functioning, Anderson could "only understand, remember, and carry out simple, rote instructions that require the exercise of

independent judgment or decision-making for problems involving concrete variables in routine situations during two-hour work segments."  The ALJ also found that Anderson "should work in a task or object-oriented setting as opposed to a service-oriented setting, and may have no work-related interaction with the public."

At steps four and five, based on the testimony of a vocational expert, the ALJ concluded that Anderson could not do his past work, but he could perform other jobs which exist in significant numbers in the national and local economy.  As a result, Anderson was not disabled from December 3, 2004 through October 22, 2006.

## ISSUES RAISED BY PLAINTIFF

In his brief (Doc. 23), Anderson raises the following issues:

1. Whether the ALJ erred in finding that Anderson's mental impairment did not meet Listing 12.04 prior to October 23, 2006;

2. Whether the ALJ erred in finding that Anderson's intellectual disability did not meet Listing 12.05(C);

3. Whether the ALJ erred in assessing his mental residual functional capacity;

4. Whether the ALJ erred in assessing his physical residual functional capacity.

## ANALYSIS

Within each of the broad issues raised by Anderson and listed above, he makes a number of sub-arguments based on a variety of errors allegedly made by ALJ Janney.  After carefully reviewing each of Anderson's arguments and the Commissioner's responses, the Court has decided in the interest of judicial

economy to address only Anderson's first argument, which is his strongest argument and necessitates remand.

In the 2009 decision, ALJ Lyman determined that Anderson's depression met the requirements of Listing 12.04 for Affective Disorder beginning on October 23, 2006, and that Anderson was disabled as of that date (Tr. 603).   Due to flaws in ALJ Lyman's decision, however, the parties stipulated that remand was necessary.   On remand, ALJ Janney was instructed to consider in accordance with Social Security Ruling 83-20 ("SSR 83-20") whether Anderson's impairments rendered him disabled prior to October 23, 2006 (Tr. 588).   It was particularly crucial to determine whether Anderson was disabled prior to the date his insured status and eligibility for DIB expired, which was on June 30, 2005.   ALJ Janney determined that Anderson had the severe impairment of depression before his date last insured, however, ALJ Janney ultimately concluded that Anderson was not disabled at any time before his date last insured (Tr. 469, 477).

Anderson argues that ALJ Janney failed to follow the instructions of the Appeals Council and did not properly apply the analytical framework outlined in SSR 83–20 to determine the onset date of Anderson's disability.   The Court agrees. In fact, the Court is convinced that ALJ Janney entirely disregarded the Appeals Council's instructions to employ the framework of SSR 83-20.

## A. Social Security Ruling 83-20

"Where, as here, a claimant is found disabled but it is necessary to decide whether the disability arose at an earlier date, the ALJ is required to apply the

Page 17 of 34

analytical framework outlined in SSR 83–20 to determine the onset date of disability." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). The onset date of disability is defined as "the first day an individual is disabled as defined in the Act and the regulations." Social Security Ruling 83-20 ("SSR 83-20"), 1983 WL 31249, at *1 (1983). In the case of slowly progressive impairments, SSR 83–20 does not require the impairment to have reached the severity of a listed impairment before onset can be established. SSR 83-20 at *2. Instead, "[t]he onset date should be set on the date when it is most reasonable to conclude from the evidence that the impairment was sufficiently severe to prevent the individual from engaging in SGA (or gainful activity) for a continuous period of at least 12 months or result in death." *Briscoe*, 425 F.3d at 352 (quoting SSR 83–20 at *3).

For disabilities of non-traumatic origin, like depression, SSR 83-20 requires the ALJ to consider three things when determining the onset date of disability: the claimant's allegations, the claimant's work history, and the medical and other evidence. SSR 83-20 at *2. The date alleged by the claimant is the "starting point" in determining the onset date, and that date should be used if it is consistent with all available evidence. SSR 83-20, at *2, 3. As for the claimant's work history, "[t]he day the impairment caused the individual to stop work is frequently of great significance in selecting the proper onset date." SSR 83-20 at *2. Nevertheless, the medical evidence is "the primary element in the onset determination" and the chosen onset date "can never be inconsistent with the

medical evidence of record."   SSR 83-20 at *2.   "This does not mean that a claim is doomed for lack of medical evidence establishing the *precise* date an impairment became disabling." *Briscoe*, 425 F.3d at 353 (emphasis in original); *see* SSR 83-20 at *2.   "In such cases, the ALJ must infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process, and should seek the assistance of a medical expert to make this inference." *Briscoe*, 425 F.3d at 353 (citing SSR 83-20 at *2) (internal quotation marks omitted).   If reasonable inferences cannot be made from the available evidence and additional medical evidence is not available, it may be necessary to obtain information from other sources such as family members, friends, and former employers.   SSR 83-20, at *3.

The ALJ must give a "convincing rationale" for the onset date selected.   SSR 83-20, at *3.   When a claimant challenges the onset date selected by the ALJ, "the issue is whether there is substantial evidence in the record to support the date chosen by [the ALJ], not whether an earlier date could have been supported.'" *Henderson ex rel. Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999) (quoting *Stein v. Sullivan*, 892 F.2d 43, 46 (7th Cir. 1989)).

**B. ALJ Janney Did Not Employ Social Security Ruling 83-20**

ALJ Janney did not specifically refer to SSR 83-20 in his decision (Tr. 465–78).   However, "this omission by itself is not reversible error" so long as the ALJ conducted the requisite analysis.   *Briscoe*, 425 F.3d at 352; *Pugh v. Bowen*, 870 F.2d 1271, 1274 (7th Cir. 1989).   A careful review of the decision leads the Court

to conclude that ALJ Janney did not employ an analysis that looked anything like that set forth in SSR 83-20.

Under the framework of SSR 83-20, the starting point was the onset date alleged by Anderson: December 3, 2004.[4]   The ALJ was then required to analyze whether Anderson's work history was consistent with the alleged onset date.   ALJ Janney acknowledged that Anderson had not worked since the alleged onset date, but he never discussed Anderson's work history in the context of analyzing the onset date of his disability (Tr. 469).   The Court's own independent review of the record establishes that Anderson has a 27-year work history beginning in 1974 and ending in 2001 (Tr. 694–97).[5]   After 2001, with the exception of earning $293.25 in 2006, there are no additional earning records for Anderson.   It appears to the Court that Anderson's work history is perfectly consistent with his alleged disability onset date.   *See* SSR 83-20, at *2.

Next, ALJ Janney should have analyzed whether the medical evidence and non-medical evidence supported the alleged onset date.   In particular, the ALJ should have determined whether the medical records established a precise date on which Anderson's depression became disabling.   *See* SSR 83-20 at *2.   If not, the ALJ should have sought the assistance of a medical expert to infer the onset date from the available evidence.   If no reasonable inference could be drawn, the ALJ

---

[4] Anderson originally alleged that his disability began in February 2001; however, he effectively amended his alleged onset date to December 3, 2004, which is the day after he received the previous unfavorable decision from ALJ Mills (Doc. 23, p.2).

[5] Anderson's yearly earnings varied from a low of approximately $1,500 to a high of approximately $15,000 with three exceptions: in 1974, Anderson earned only $74.25; in 1977, Anderson had no earnings; and in 1998, Anderson earned only $925.02 (Tr. 697).

should have explored other sources of evidence.

Here, ALJ Janney considered only a portion of the relevant medical evidence and his evaluation of that evidence is seriously flawed.   Additionally, ALJ Janney failed to develop or adequately consider the non-medical evidence in the record.

### 1. Dr. David Warshauer, the examining state-agency psychologist

ALJ Janney first looked at the records from Dr. David Warshauer, the examining state-agency psychologist.   Dr. Warshauer examined Anderson on October 23, 2006, assessed a GAF score of 45, and diagnosed him with severe, recurrent major depressive disorder.   Almost a year later, on September 19, 2007, Dr. Warshauer administered an IQ test to Anderson (Tr. 330–331).   Following the IQ test, Dr. Warshauer completed a medical source statement and gave his opinions regarding Anderson's mental limitations and ability to do work-related activities (Tr. 332–34).   For the sake of ease, the 2006 opinion and the 2007 assessment will be referred to collectively as Dr. Warshauer's "opinions."

In evaluating Dr. Warshauer's opinions, ALJ Janney's sole job was to determine whether the opinions were consistent with the earlier onset date alleged by Anderson.   It appears to the Court that Dr. Warshauer's opinions undoubtedly supported an earlier onset date.   In determining that Anderson's depression first met regulation listing severity on October 23, 2006, it is clear that ALJ Lyman relied solely on the evaluation by Dr. Warshauer.   This was the first mental status evaluation in the medical records and Anderson was diagnosed with severe, recurrent major depressive disorder.   However, it is well-established that "the

critical date is the *onset* of disability, *not* the date of diagnosis." *Lichter v. Bowen*, 814 F.2d 430, 435 (7th Cir. 1987) (emphasis in original) (citation omitted); *see also Briscoe*, 425 F.3d at 353 (noting "it is contrary to SSR 83-20" for ALJ to base disability determination on the first date of diagnosis).   If Anderson's depression was severe enough to render him disabled on the first time he saw Dr. Warshauer, and he had suffered previous episodes of severe depression, there is unquestionably a basis for inferring that the onset occurred at some point prior to the date of the first recorded medical examination establishing disability.   *See Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) ("[P]sychological disorders usually do not occur overnight . . . ."); *Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989) (explaining "there is the common sense notion" that is "somewhat acknowledged by SSR 83–20," that claimant does not suddenly become disabled on the date of examination.); SSR 83-20, at *3 ("In some cases, it may be possible, based on the medical evidence[,] to reasonably infer that the onset of a disabling impairment occurred some time *prior to the date of the first recorded examination* . . . .") (emphasis added).   In other words, it stands to reason that Anderson did not suddenly come down with severe depression of a disabling degree on October 23, 2006.   However, ALJ Janney's decision does not acknowledge the probability that Anderson was disabled prior to October 23, 2006, much less analyze whether Dr. Warshauer's opinions are consistent with that probability.

Instead, in evaluating Dr. Warshauer's opinions, ALJ Janney did nothing more than attack the underpinnings of the opinions, and question whether the

opinions could be used to support a disability onset date of October 23, 2006 (Tr. 470–71, 476).   This approach serves to illustrate that ALJ Janney completely disregarded the analytical framework of SSR 83-20.   There was no reason for ALJ Janney to re-evaluate, or to even question, the basis for Anderson's prior approval of benefits.   ALJ Janney should have been operating on the premise that Anderson was, in fact, disabled as of October 23, 2006.   It is clear that ALJ Janney did not accept this premise given that he openly acknowledged his belief to the contrary. Specifically, he stated:

> If both the United States District Court for the Southern District of Illinois and the Appeals Council had not limited the time period under consideration through October 22, 2006, the undersigned would have revisited the issue of disability beginning on October 23, 2006.   The basis for disability beginning on that date appears to have been Dr. Warshauer's opinion.   Dr. Warshauer's opinion was predicated on assumptions proven to be false by the remainder of the claim file. This means that if a finding of disability was justified, it would not have been until a much later date.   Unfortunately, the remand orders effectively preclude disturbing the onset date of October 23, 2006.

(Tr. 476).

The implication is clear: if Dr. Warshauer's opinions could not support a disability onset date of October 23, 2006, in turn, they obviously could not support an earlier onset date (Tr. 470–71, 476).   However, questioning the prior approval of benefits in order to deny an earlier onset date does not square with the analytical framework of SSR 83-20.   In fact, it is a blatant end-run around the requirements of SSR 83-20.

Furthermore, ALJ Janney's reasons for discrediting Dr. Warshauer's

opinions do not withstand scrutiny.   ALJ Janney found that Dr. Warshauer's opinions were based, in part, on an assumption that Anderson was not using drugs or drinking alcohol.   However, **ALJ Janney located evidence in the record showing that Anderson was not completely abstinent from marijuana or alcohol.   He therefore** reasoned that "knowledge of the ongoing substance use would likely have had a material impact on Dr. Warshauer's opinion or on his assessment of the validity of IQ scores.   In fact, Dr. Warshauer explicitly said as much" (Tr. 471).

First and foremost, ALJ Janney's suggestion that Anderson's marijuana use would have impacted Dr. Warshauer's assessment is ludicrous because there is absolutely no evidence that Anderson was smoking marijuana at the time he saw Dr. Warshauer.   The only evidence of marijuana use cited by ALJ Janney is from September 2008, which is a year after the last time Anderson saw Dr. Warshauer (Tr. 450-52).   Simply put, it is irrational to conclude that Anderson's marijuana use in September 2008 would have affected his mental capabilities a year earlier.

Second, while it is true that Dr.   Warshauer said his assessment of Anderson's ability to do work-related activities was based on the assumption that Anderson was abstinent from alcohol and other substances, Dr. Warshauer never indicated how, and to what degree, Anderson's use of alcohol or other substances would change his assessment (*See* Tr. 333).[6]   Therefore, ALJ Janney's conclusion

---

[6] The form that Dr. Warshauer filled out asked, in part: "If the claimant's impairment(s) include alcohol and/or substance abuse, do these impairments contribute to any of the claimant's limitations as set forth above?   If so, please identify and explain what changes you would make to you answers if the claimant was totally abstinent from alcohol and/or substance use/abuse" (Tr. 333).   Dr. Warshauer answered: "N/A   All of the above answers apply to the claimant assuming that

that it would "have a material impact on" or "invalidate" the assessment is nothing more than baseless speculation.  *See Harlin v. Astrue*, 424 F. App'x 564, 568 (7th Cir. 2011) ("To the extent that the ALJ projected how Dr. Rozenfeld's would have testified had she seen the additional documents, the ALJ improperly assumed the role of doctor." (citing *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010))). Furthermore, the Court is skeptical that the evidence regarding Anderson's alcohol use would actually change Dr. Warshauer's assessment.   The evidence regarding Anderson's alcohol use is limited to a note from March 2006 and a note from May 2006 in which Dr. Saqib indicated that Anderson smelled like alcohol (Tr. 319, 324).   It seems unlikely that two isolated incidents of alcohol use would have a material impact on Dr. Warshauer's assessment, much less completely invalidate it.

### 2.  Dr. Margaret Wharton, non-examining state-agency psychologist

ALJ Janney next looked at the opinion of Margaret Wharton, PsyD, the non-examining state agency psychologist.   She completed a Psychiatric Review Technique Form and a Mental Residual Functional Capacity Assessment, and determined that Anderson was not disabled as of November 6, 2006 (Tr. 270–87). Dr. Wharton's opinion was essentially rejected by ALJ Lyman in his 2009 decision when he determined that Anderson was in fact disabled beginning October 23, 2006.

Given that Dr. Wharton did not believe Anderson was disabled as of October

---

he is abstinent from alcohol and other substances.   However, when I evaluated him in October of 2006 he indicated that in the past he and his wife drank a lot and he quit 3 ½ years prior to that evaluation.   I do not know if he is still abstinent or not" (Tr. 333).

23, 2006, her opinion obviously could not shed any light on whether Anderson's disability onset date was prior to October 23, 2006.   In other words, her opinion was completely irrelevant to ALJ Janney's task and there was no reason for him to evaluate it.   The fact that ALJ Janney considered this opinion at all illustrates that he was not following the dictates of SSR 83-20.

### 3. Dr. Zahid Saqib, the treating physician

The only other medical evidence ALJ Janney discussed were the records of Dr. Zahid Saqib, Anderson's family physician since 2003 (*See* Tr. 799).   The discussion was brief, four lines to be exact.   ALJ Janney noted that outside of obtaining medication from Dr. Saqib, there is no evidence that Anderson received any dedicated inpatient or outpatient mental health treatment.   ALJ Janney further noted that Dr. Saqib's treatment notes do not indicate any significant depressive symptoms, and there is no indication that Dr. Saqib ever referred Anderson for treatment (Tr. 474).

ALJ Janney is mistaken that Anderson did not receive any mental health treatment outside of obtaining medication from Dr. Saqib.   There are a number of medical records that were either unintentionally overlooked or completely ignored by ALJ Janney, which show that Anderson was suffering from a mental health impairment for a number of years prior to the alleged onset, and that he tried a number of psychiatric medications from 2001 to 2006, including fluoxetine, Xanax,

Celexa, Amitriptyline, Valium, Paxil, Effexor, Cymbalta, and Klonopin.[7]   Although it is not clear who prescribed him the medications, the simple fact that they were prescribed suggests that Anderson sought treatment on a number of occasions.

Moreover, despite being medicated, Anderson continued to suffer psychiatric symptoms.   In other words, it does not appear that Anderson's depression and anxiety were completely controlled by medication.   For example, in September 2002, when Anderson was apparently taking Valium, Dr. Steven Rupert was forced to stop a medical procedure because Anderson was having chest pains due to anxiety (Tr. 780).   Dr. Rupert referred Anderson to "Dr. Conn" for his anxiety and Dr. Conn prescribed two medications (Tr. 780)   Additionally, during Dr. Warshauer's evaluation, Anderson was apparently taking Klonopin, yet "sobbed uncontrollably," his affect sad and tearful, and his mood was depressed (Tr. 268).

As for the fact that Dr. Saqib's treatment notes do not indicate any significant depressive symptoms, this is a rather unimpressive fact.   Dr. Saqib appears to be a man of few words.   By the Court's own count, there were 66 occasions on which Dr. Saqib was in contact with Anderson, including 33 office visits, over the course of five years, from 2004 through 2008.[8]   His notes from all of these occasions total a mere 36 pages, and they are largely illegible.   The only note that the Court was able to make out regarding Anderson's mental condition is from July 2004, where Dr. Saqib wrote that Anderson complained of being "nervous and depressed" and

---

[7] (Tr. 267, 315, 396, 535, 722, 724, 726–27, 743, 769, 776, 779, 780, 782, 785, 788, 792).
[8] (Tr. 248–49, 254–56, 258–59, 262–63, 310, 313–16, 327, 340, 419–36, 797–99)

he prescribed Anderson Effexor XR (Tr. 797).   Dr. Saqib also prescribed Cymbalta and Klonopin to Anderson in February 2005 without so much as mentioning his mental condition (Tr. 396).   The ready conclusion is that Dr. Saqib has poor documentation habits, not that Anderson's mental condition was not severe.

The fact that Dr. Saqib did not refer Anderson to a mental health professional is also unimpressive.   While the lack of a referral could mean that Anderson's depression was not severe, it could also mean that Dr. Saqib was not paying close attention to Anderson's depression.   Dr. Saqib was Anderson's family physician and the records reveal that he saw Anderson almost exclusively for physical ailments, except for the two occasions noted in the previous paragraph where he prescribed anti-depressant and anti-anxiety medication.   As the Seventh Circuit noted long ago, "there is no reason to expect a doctor asked about an eye problem, or a back pain, or an infection of the urinary tract to diagnose depression. He is not looking for it, and may not even be competent to diagnose it."   *Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir. 1995).   Furthermore, the Seventh Circuit has recognized that depression is a "notoriously underreported disease" and therefore it may be disabling even when a claimant has not been treated by a mental health professional.   *Wilder v. Chater,* 64 F.3d 335, 337 (7th Cir.1995).   *See also Kangail v. Barnhart,* 454 F.3d 627, 629–30 (7th Cir. 2006) ("[M]ental illness in general . . . may prevent the sufferer from taking her prescribed medicines or otherwise submitting to treatment."); *Nguyen v. Chater,* 100 F.3d 1462, 1465 (9th Cir. 1996) (The fact that [a] claimant may be one of millions of people who did not

seek treatment for a mental disorder until late in the day is not a substantial basis on which to conclude that [the psychologist's] assessment of [the] claimant's condition is inaccurate."); *Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989) ("Appellant may have failed to seek psychiatric treatment for his mental condition, but it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation.").

Even if ALJ Janney was right about the lack of significant symptoms in Dr. Saqib's notes and the lack of a referral to a mental health professional, those two facts alone do not constitute "substantial evidence" to support ALJ Janney's decision that Anderson's disability onset date was not prior to October 23, 2006.

### 4.  Testimony of Mr. & Mrs. Anderson

ALJ Janney's development and review of the non-medical evidence in the record was inadequate, to put it mildly.   He squandered his opportunity to obtain evidence from Anderson regarding his mental condition.   As noted, the issue was Anderson's condition from December 3, 2004 to October 22, 2006, not his current condition.   However, at the hearing in September 2012, virtually all of ALJ Janney's questions to Anderson focused on the present.    In fact, over an hour into the hearing, ALJ Janney admitted that he had overlooked that a closed period was at issue (Tr. 547).

That being said, Anderson still provided a bit of testimony that tends to support his alleged onset date.   Anderson testified that he has contemplated suicide more than once.   He testified that he "just feels depressed" and will stay in

bed for a week at a time.   He frequently cries over his health problems.   He said he's had these symptoms since 2002, "ever since I found out all the stuff that's wrong with me" (Tr. 536).   However, ALJ Janney failed to even mention any of this testimony.

As for Anderson's wife, she filled out a third party function report on September 13, 2006 that substantiates her husband's testimony (Tr. 172–79). ALJ Janney mentioned portions of the third party function report, including that Anderson was easily irritated, had difficulty paying attention, did not finish what he started, had difficulty following written or spoken instructions, did not get along with authority figures, and did not handle stress or changes in routine well (Tr. 473).   But ALJ Janney left out the analysis of the evidence; he did not indicate whether he thought this evidence supported the alleged onset date or not. Additionally, ALJ Janney did not mention any of the most salient, written explanation that Mrs. Anderson gave, such as her husband's "jeckle [sic] and hyde personality."

ALJ Janney also squandered his opportunity to obtain testimony from Mrs. Anderson about her husband's mental condition.   He was initially reluctant to put Mrs. Anderson on the stand because the hearing had already lasted for two hours (*See* Tr. 568–69).   Then he asked if Mrs. Anderson's testimony could be kept to ten minutes (Tr. 568).   Then he suggested that instead of her taking the stand, her testimony should be submitted in writing (Tr. 569).   When the attorney stated that the testimony was more compelling in person, ALJ Janney asked "do you think you

can do it in eight minutes or less?" (Tr. 569).

ALJ Janney's concern about the hearing running longer than two hours is comical given the fact that he spent over half of that time asking the claimant completely irrelevant questions.   It is also truly unfortunate because it seems to the Court that Mrs. Anderson's testimony was crucial—the Court is skeptical that a reasonable inference as to onset date can be drawn from the medical records, meaning the ALJ would need to explore other sources of evidence, and Anderson's depression and intellectual impairment made his testimony regarding the timeline of his condition questionable.[9]   Therefore, Mrs. Anderson's testimony regarding Anderson's condition during the time frame in question is absolutely indispensable. Yet ALJ Janney asked her only three questions, which were anything but probing—how long she was married to the claimant, what's the longest she's gone without seeing the claimant, and whether she was living in the same home as the claimant during the relevant period of time (Tr. 572–73).   And he cut off the attorney's questioning after no more than ten minutes.

In conclusion, ALJ Janney failed to employ the analytical framework of SSR 83-20 in determining the onset date of Anderson's disability, and his determination that Anderson's onset date was not prior to October 23, 2006 is not supported by

---

[9] For example, Anderson's attorney asked "were you taking anything for your nerves before Dr. Saqib" prescribed medication in 2005 (Tr. 538).   Anderson replied "no," but there is medical evidence showing he took Xanax, Ativan, Valium, and two medications prescribed for anxiety by Dr. Conn prior to seeing Dr. Saqib (Tr. 722, 724,738, 726–27, 743, 769, 780, 782, 785).   His attorney then asked if how many years ago Dr. Saqib treated him for depression, and Anderson answered, "eleven, eleven and a half" (Tr. 539).   His attorney then said, "from today, September 2012, back to February 2005, you think that would be about 11 years?" and Anderson answered, "yeah" (Tr. 539).

**substantial evidence.**   The non-medical evidence, that is the information provided by Anderson and his wife, seems to support an earlier onset date.   The medical evidence also seems consistent with an earlier onset date.   In looking at the medical records, it is clear that Anderson was suffering from a mental impairment long before October 23, 2006.   It also appears that he sought treatment on a number of occasions, but medication did not completely control his symptoms. However, there is nothing solid in the medical records pointing to any one date as the tipping point where Anderson's mental impairment became disabling. Therefore, ALJ Janney had to infer the date from the records, and he should have sought the assistance of a medical expert in doing so.   *Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir. 1995) ("The question of what stage a physical or mental illness had probably reached some years before it was first diagnosed is a medical question."); SSR 83-20 at *3 ("[T]he [ALJ] should call on the services of a medical advisor when onset must be inferred.")   If a date could not be reasonably inferred, then ALJ Janney had to obtain information from other sources.   Here, ALJ Janney did not consult a medical expert, and he wasted his opportunity to collect more information from Mrs. Anderson.

Anderson requests that the Court reverse the Commissioner's decision and remand for an award of benefits, or, in the alternative, reverse the decision of the ALJ and remand this matter for additional proceedings.   An award of benefits is appropriate "only if all factual issues have been resolved and the record supports a finding of disability."   *Briscoe,* 425 F.3d at 356.   Although Plaintiff requests an

award of benefits for the time between December 3, 2004 and October 22, 2006, he fails to present a developed argument in favor of doing so.   In this case, the disability onset date selected by the ALJ was not supported by substantial evidence. The medical evidence of record does not reveal an obvious alternative date of disability onset, ALJ Janney did not consult a medical expert to infer the onset date, nor did he adequately explore other sources of evidence.   Anderson's quest for DIB has been ongoing for over 10 years, and yet incredibly, there are still factual issues that have not been resolved.    Therefore, an outright award of benefits as of the disability onset date is not possible without additional information. Accordingly, reversal and remand for further proceedings is the proper remedy.

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Anderson should be awarded benefits for the time period in question.   On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

<u>**CONCLUSION**</u>

The Commissioner's final decision denying Ronald Anderson's application for social security disability benefits and supplemental security income is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence <u>four</u> of **42 U.S.C. §405(g).**

The Clerk of Court is directed to enter judgment in favor of Plaintiff Ronald

Anderson.

**IT IS SO ORDERED.**

**DATE:   September 24, 2014.**


**s/ Clifford J. Proud_____**
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**